IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ST. PAUL FIRE AND MARINE INSURANCE COMPANY,**<br><br>  *Plaintiff*<br>  v.<br><br>**PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY,**<br><br>  *Defendant.* | Case No. 2:19-cv-05471-JDW |

**MEMORANDUM**

This insurance coverage dispute presents a tangle of contracts, including a commercial lease and four separate insurance policies, that could determine the outcome. The roadmap to sort out that tangle is, as is so often the case, the words of those contracts. Read carefully, the words that the parties used when they entered into those various contracts clear away the tangle and reveal a single path forward. As explained below, the end of that journey is that Pennsylvania National Mutual Casualty Insurance Company ("Penn National") must reimburse St. Paul Fire and Marine Insurance Company $2.5 million, the amount that St. Paul contributed towards a settlement of an underlying lawsuit against a company that St. Paul and Penn National both insured.

I.   **BACKGROUND**

On November 7, 2014, Michael Darnell Wise suffered injuries while operating a forklift at work. While Mr. Wise was moving auto parts, the forklift fishtailed and fell

from a loading dock or the ramp leading up to it, leaving Mr. Wise pinned beneath the forklift. At the time of the accident, Mr. Wise was working for Central Coast Distribution, LLC d/b/a Mighty Auto Parts.

### A.     The Lease

Pursuant to a Standard Form Industrial Building Lease (the "Lease"), Central Coast leased a warehouse from First Industrial, L.P. to conduct its business, in Harrisburg, Pennsylvania. The Lease gave Central Coast a leasehold over a specific portion of the warehouse and gave it access to common areas of the property, including "loading areas." (ECF No. 32-9 at § 4.2.) The Lease required both Central Coast and First Industrial to maintain insurance and included a waiver of subrogation provision, which provided:

> Notwithstanding anything to the contrary in this Lease, Landlord and Tenant mutually waive their respective rights of recovery against each other and each other's officers, directors, constituent partners, members, agents and employees …. This provision is intended to waive, fully and for the benefit of each party to this Lease, any and all rights and claims that might give rise to a right of subrogation by any insurance carrier. Each party shall cause its respective insurance policy(ies) to be endorsed to evidence compliance with such waiver.

(*Id.* at § 10.3.)

### B.     Central Coast's Insurance Policies

Central Coast purchased two insurance policies from Penn National that are at issue. The first is a businessowner's liability coverage policy, policy no. BP9 0689007, that has a liability limit of $1,000,000 per occurrence (the "Penn National Primary Policy"). (ECF No. 32-11.) The policy covers damages as a result of bodily injury. (*Id.* at STPAUL001374.) The Penn National Primary Policy includes an endorsement that

identifies First Industrial as an additional insured on a schedule of additional insureds and provides:

> The person or organization shown in the Schedule is also an insured, but only with respect to liability arising out of the ownership, maintenance or use of that part of the land leased to you and shown in the Schedule and subject to the following additional exclusions: ….

(*Id.* at STPAUL001403.)

Central Coast also purchased a commercial umbrella liability policy from Penn National, policy no. UL90689007, with a liability limit of $2,000,000 per occurrence (the "Penn National Umbrella Policy"). (ECF No. 1, Ex. D.) That policy lists Central Coast as the named insured but provides that "[a]ny additional insured under any policy of 'underlying insurance' will automatically be an insured under this insurance." (*Id.* at Section II ¶ 3.) Penn National agreed to "pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit' because of 'bodily injury' or 'property damage' to which this insurance applies." (*Id.* at Section I ¶ 1.a.) The "ultimate net loss" is "the total sum, after reduction for recoveries or salvages collectible, that the insured becomes legally obligated to pay as damages by reason of settlement or judgments or any arbitration or other alternate dispute method entered into with our consent or the 'underlying insurer's' consent." (*Id.* at Section V ¶ 25.) The "retained limit" is "the available limits of 'underlying insurance' scheduled in the Declarations …." (*Id.* at Section V ¶ 22.) The Schedule of Underlying Insurance lists the Penn National Primary Policy, as well as two other policies not relevant here. (*Id.* at Schedule of Underlying Insurance.)

The Penn National Umbrella Policy also has an "Other Insurance" provision that provides:

> a. This insurance is excess over, and shall not contribute with any of the other insurance, whether primary, excess, contingent or on any other basis. This condition will not apply to insurance specifically written as excess over this Coverage Part.

(*Id.* at Section III ¶ 5.)

### C. First Industrial's Insurance Policies

First Industrial also purchased two insurance policies that relate to the present dispute. It purchased a general liability policy from Federal Insurance Company ("FIC"), policy no. 9947-59-56 REU (the "FIC Policy"), with a liability limit of $1,000,000 per occurrence. It also purchased a special commercial umbrella liability policy from St. Paul, policy no. ZUP-14N95053-14-NF (the "St. Paul Policy"). St. Paul agreed to pay on behalf of First Industrial "all sums in excess of the Retained Limit that [First Industrial] becomes legally obligated to pay as damages by reason of liability imposed by law … because of: Bodily Injury … that occurs during the Policy Period and is caused by an Occurrence[.]" (ECF No. 32-13 at Section I.A.1.) The policy defines "Retained Limit" as "the total of the applicable limits of all Scheduled Underlying Insurance, and the applicable limits of any Other Insurance, for Bodily Injury … covered by such … Other Insurance[.]" (*Id.*) "Other Insurance" is "any insurance providing coverage for damages covered in whole or in part by this policy." (*Id.* at Section IV.P.) The FIC Policy is listed as Scheduled Underlying Insurance. (*Id.* at Scheduled Underlying Insurance.)

4

Like the Penn National Umbrella Policy, the St. Paul Policy has an "Other Insurance" provision that provides:

> If Other Insurance applies to damages that are also covered by this policy, this policy will apply excess of, and shall not contribute with, that Other Insurance, whether it is primary, excess, contingent or on any other basis. However, this provision will not apply if the Other Insurance is specifically written to be excess of this policy.

(*Id.* at Section VII.L.)

### D.   The Underlying Personal Injury Action

After his accident, Mr. Wise filed suit against First Industrial and others. First Industrial and its insurer St. Paul tendered the defense and indemnity of First Industrial in the underlying action to Penn National on multiple occasions. On January 8, 2019, the parties attended a mediation to resolve Mr. Wise's claims. At the mediation, St. Paul and FIC reached a $3.5 million settlement of all of the claims that Mr. Wise asserted against First Industrial. St. Paul contributed $2.5 million towards that settlement, and FIC contributed $1 million. Penn National attended the mediation, but it is unclear to what extent, if any, it participated. However, it is undisputed that Penn National did not contribute any settlement funds on behalf First Industrial.

### E.   The Present Action

On November 21, 2019, St. Paul brought this case against Penn National, seeking a declaratory judgment that Penn National had to indemnify First Industrial pursuant to the Penn National Policies and an award of all sums that St. Paul had paid to settle Mr. Wise's claims against First Industrial. The parties filed cross-motions for summary judgment, which are ripe for disposition.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted).

The filing of cross-motions does not change this analysis. *See Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001). It "does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." *Id.* at 560 (quotation omitted). Rather, "[w]hen confronted with cross-motions for summary judgment 'the court must rule on each party's motion on an individual and separate basis, determining, for each side,

6

whether a judgment may be entered in accordance with the Rule 56 standard.'" *Canal Ins. Co. v. Underwriters at Lloyd's London*, 333 F. Supp. 2d 352, 353 n.1 (E.D. Pa. 2004), *aff'd*, 435 F.3d 431 (3d Cir. 2006).

## III.   DISCUSSION

Under Pennsylvania law, which the parties agree applies, "[t]he interpretation of an insurance policy is a question of law …." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006). Thus, "[t]he task of interpreting a contract is generally performed by a court rather than by a jury." *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983). The Court's goal "is to ascertain the parties' intentions as manifested by the policy's terms." *Kvaerner Metals*, 908 A.2d at 897 (quotation omitted). When policy language is clear and unambiguous, a court applying Pennsylvania law must give effect to that language. *Id*. However, when a policy provision is ambiguous, a court must construe the policy "in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage." *Id.* (quotation omitted). "Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *401 Fourth St., Inc. v. Inv'rs Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005) (quotation omitted).

### A.   First Industrial's Status

The Penn National Primary Policy lists First Industrial as an additional insured, "but only with respect to liability arising out of the ownership, maintenance or use of that part of the land leased to [Central Coast] …." (ECF No. 32-11 at STPAUL001403.)

7

Even if Mr. Wise's injury occurred in a common area of the warehouse, not within the space that Central Coast leased from First Industrial, that distinction would not permit Penn National to avoid coverage. It is "well-settled in Pennsylvania" that the phrase "arising out of" in an insurance policy means "causally connected with, not proximately caused by." *Allstate Prop. & Cas. Ins. Co. v. Squires*, 667 F.3d 388, 391 (3d Cir. 2012) (quoting *Mfrs Cas. Ins. Co. v. Goodville Mut. Cas. Co.*, 170 A.2d 571, 573 (Pa. 1961)). Under this standard, '[b]ut for' causation, i.e. a cause and result relationship," satisfies the "arising out of" language in a policy. *See id.* Under this formulation, First Industrial qualifies as an insured under the Penn National Primary Policy.

But for Central Coast's use of the warehouse to operate its business, Mr. Wise would not have been injured. Indeed, there is no dispute that Mr. Wise was performing his work for Central Coast at the time of his accident. It does not matter whether the accident occurred on the loading dock or on the ramp, or whether the loading dock and ramp were part of the premises that Central Coast leased from First Industrial. Because First Industrial is an insured under the Penn National Primary Policy, it also qualifies as an insured under the Penn National Umbrella Policy, which lists the Penn National Primary Policy on its Schedule of Underlying Insurance.

B.   **The Waiver Of Subrogation Provision**

"[U]nder Pennsylvania law, subrogation is a contingent and derivative right, and a subrogee stands in the shoes of the subrogor and 'can only recover damages when his subrogor has a legally cognizable cause of action against a third party.'" *Universal Underwriters Ins. Co. v. A. Richard Kacin, Inc.*, 916 A.2d 686, 693 (Pa. Super. Ct. 2007). First Industrial and Central Coast included a waiver provision in the Lease

and agreed to "mutually waive their respective rights of recovery against each other and each other's officers, directors, constituent partners, members, agents and employees[.]" (ECF No. 32-9 at § 10.3.) Pennsylvania law allows for such a provision. *See Universal Underwriters*, 916 A.2d at 694. But it does not apply here.

Under the plain language of the Lease, First Industrial agreed to waive its right of recovery against Central Coast and Central Coast's officers, directors, constituent partners, members, agents, and employees. There is no evidence (or argument) that Penn National is any of those things. The fact that the parties "intended to waive, fully and **for the benefit of each party to [the] Lease**, any and all rights and claims that might give rise to a right of subrogation by any insurance carrier" does not contradict this finding. (ECF No. 32-9 at § 10.3 (emphasis added).) The "benefit of each party" language in this provision, and the fact that the provision also provides that First Industrial and Central Coast waived claims against each other, demonstrates that the parties intended the waiver-of-subrogation provision to apply to claims between the parties. That is, it waived a subrogation claim that First Industrial (or First Industrial's insurer, standing in its shoes) might assert against Central Coast (or Central Coast's insurer, standing in its shoes), or vice versa.

St. Paul's claim in this case does not fall within that scope. The provision would apply if St. Paul asserted a claim against Central Coast or Penn National, standing in Central Coast's shoes. But that's not what this case is about. Instead, St. Paul's claim against Penn National stems from Penn National's status as First Industrial's insurer (via the additional insured provision). So, while this is a subrogation claim, it is not a subrogation claim that arises out of a dispute between First Industrial and Central

9

Coast. It is therefore outside the scope of the waiver-of-subrogation provision in the Lease.

The case on which Penn National relies, *Commercial Union Ins. Co. v. Bituminous Cas. Corp.*, 851 F.2d 98 (3d Cir. 1988), does not support its position. *First*, the Court of Appeals appeared to treat the subcontractor and its insurer as one and the same, for purposes of determining whether a waiver of subrogation prevented the building owner's insurer from bringing a suit against the subcontractor's insurer. But the plain language of the Lease at issue here offers no basis for the Court to do so. *Second*, because the governing contract shifted the ultimate risk of loss to the owner in order to avoid disputes among construction project participants, the Court of Appeals determined that that policy goal would be best effectuated by interpreting the waiver clause as abrogating any subrogation right of the building owner's insurer against the subcontractor. *Id.* at 101. There are no similar policy concerns here. On the contrary, the Lease did not attempt to shift the ultimate risk of loss to the owner. It required both parties to maintain insurance. *Third*, unlike the building owner in *Commercial Union*, First Industrial is an insured on both Penn National policies, so there is a third-party obligor responsible to First Industrial for the loss—Penn National. Thus, St. Paul derived the right to proceed against Penn National by way of subrogation.

C.     **Priority Of Coverage**

Both the Penn National Umbrella Policy and the St. Paul Policy cover First Industrial for losses suffered as a result of bodily injury. And both include "other insurance" provisions that purport to make the policies excess of any other applicable insurance. Because both clauses are excess clauses that apply here, the Court must

10

determine whether it can reconcile those provisions or whether they are mutually exclusive. *See Meridian Sec. Ins. Co. v. Flick*, No. 14-cv-1532, 2015 WL 3405326, at *5 (M.D. Pa. May 26, 2015).

"Courts must reconcile competing other insurance clauses when it is possible to do so." *R.R. Donnelley & Sons, Co. v. Fireman's Fund Ins. Co.*, No. 03-cv-6412, 2004 WL 2810065, at * 5 (E.D. Pa. Dec. 6, 2004) (citing *Nationwide Ins. Co. v. Horace Mann Ins. Co.*, 759 A.3d 9 (Pa. Super. Ct. 2000)). A court can reconcile policy provisions if it can give effect to both provisions at once. *See Am. Cas. Co. of Reading, Pa. v. PHICO Ins. Co.*, 702 A.3d 1050, 1054 (Pa. 1997). Excess clauses are mutually repugnant where "following the express dictates of one policy . . . would be in direct conflict with the dictates of the other." *Id.* If the policies are repugnant, the Court must disregard the excess clauses, deem them stricken, and order the insurers to share the loss. *See Allstate Ins. Co. v. Tokio Marine & Nichido Fire Ins. Co., Ltd.*, 464 F. Supp.2d 452, 463 (E.D. Pa. 2006) (citation omitted).

The Court can reconcile the "other insurance" clauses in the two policies here, so they are not mutually repugnant. Each policy provides that the "other insurance" provision "will not apply" to insurance that is "specifically written as excess over" the policy in question. (ECF No. 1, Ex. D, Section III ¶ 5; ECF No. 32-13 at Section VII.L.) The Penn National Umbrella Policy obligates it to pay losses in excess of any underlying insurance. It includes a schedule of "underlying insurance" that only lists the Penn National Primary Policy. So, the Penn National Umbrella Policy is only specifically written as excess over the Penn National Primary Policy. In contrast, the St. Paul Policy obligates it to pay losses in excess of any scheduled insurance or

"Other Insurance," and "Other Insurance is "any insurance providing coverage for damages covered in whole or in part by this policy." (ECF No. 32-13 at Section IV.P.) The St. Paul Policy is therefore specifically written in excess of both the FIC Policy, which is on a schedule of underlying insurance, and the two Penn National Policies, which fall within the St. Paul Policy's definition of "Other Insurance." This difference allows the Court to reconcile the "other insurance" provisions in the two policies without placing them in direct conflict. Pennsylvania law requires the Court to do so. The result is that the Penn National Primary Policy and the Penn National Umbrella Policy apply before the St. Paul Policy applies.

### D.     Amount Of Penn National's Obligation

FIC paid $1 million of First Industrial's settlement with Mr. Wise, and that amount is not at issue here. That leaves $2.5 million that St. Paul paid at issue. The Penn National Primary Policy applies to First Industrial's settlement with Mr. Wise because Mr. Wise's claim against First Industrial was obligated to pay damages to Mr. Wise as a result of bodily injury. It offers $1 million in coverage. The Penn National Umbrella Policy applies for the same reason. It offers an additional $2 million in coverage, which is enough to cover the remaining $1.5 million. As a result, Penn National must reimburse St. Paul the full $2.5 million that St. Paul contributed to the settlement.

As a last gasp to reduce its liability, Penn National argues that its liability cannot exceed $2 million because the Lease only obligated Central Coast to obtain $2 million in insurance, and St. Paul (standing in First Industrial's shoes) cannot obtain more protection than the Lease guaranteed First Industrial. But the Lease required First Industrial to purchase "not less than" $2 million per occurrence. (ECF No. 32-9 at §

10.2.) It set a floor, not a ceiling, on the coverage that Central Coast had to purchase. Central Coast chose to purchase more than the minimum. Nothing in the Lease prevents First Industrial (or its subrogee) from collecting on all insurance that Central Coast purchased.

## IV.   CONCLUSION

Penn National had a duty to defend and indemnify its insured, First Industrial. It did not do so, but St. Paul did. Now, St. Paul is entitled to summary judgment and to recoup the amounts it paid on behalf of Penn National's insured. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

March 8, 2021